**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JULIE SIKORSKI, et al.,          )
                                 )          3:06-cv-00696-LRH-VPC
          Plaintiffs             )
                                 )
     vs.                         )          **REPORT AND RECOMMENDATION**
                                 )          **OF U.S. MAGISTRATE JUDGE**
                                 )
GLEN WHORTON, et al.,            )
                                 )          April 30, 2009
          Defendants.            )
_____)

     This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is plaintiffs' motion for partial summary judgment (#77) and defendants' motion for summary judgment (#78).  Defendants opposed plaintiffs' motion (#81), and plaintiffs replied (#85). Plaintiffs opposed defendants' motion (#86) and defendants replied (#90).  The court has thoroughly reviewed the record and the motions and recommends that plaintiffs' motion for partial summary judgment (#77) be denied and defendants' motion for summary judgment (#78) be granted.

**I.  HISTORY & PROCEDURAL BACKGROUND**

     **A.     Procedural Background**

     Plaintiff John Witherow ("Witherow") is currently incarcerated at Nevada State Prison ("NSP") in the custody of the Nevada Department of Corrections ("NDOC") (#78).  Witherow's claims involve events that occurred while he was incarcerated at Lovelock Correctional Center ("LCC").  *Id*. Plaintiff Julie Sikorski ("Sikorski") is Witherow's mother (#61). Plaintiff Linda Dittmer ("Dittmer") is Witherow's sister. *Id*. Plaintiffs brought this action pursuant to 42 U.S.C. § 1983, alleging prison officials violated their First and Fourteenth Amendment rights during Witherow's incarceration at LCC because defendants censored, refused to deliver, and returned various pieces of mail addressed to Witherow and failed to provide plaintiffs with notice and an opportunity to appeal their decisions. *Id*. Witherow also alleges that defendants retaliated against

him for his use of the prison grievance system. *Id*. Plaintiffs name as defendants Glen Whorton, NDOC Director; Jackie Crawford, former NDOC Director; Greg Cox, NDOC Assistant Director of Operations; Jack Palmer, LCC warden; Lenard Vare, former warden of LCC; Robert LeGrand, LCC Associate Warden of Programs; Cami Perino and Celia Chacon, Correctional Caseworker Specialists at LCC, Pamela Feil, Diana Carey, and Kristina Tupa, correctional officers at LCC; Joe Gutierrez, training officer at LCC and John/Jane Doe IV-X, responsible for training defendants Feil, Carey, and Tupa. *Id*. p. 2-4. Plaintiffs allege ten causes of action, as follows:

> **Count I** - Declaratory Relief - plaintiffs request the court grant them declaratory relief that they have clearly established rights to due process of law under the Fourteenth Amendment, to freedom of speech, association, and to petition the government for redress under the First Amendment, which rights are protected by the Due Process Clause of the Fourteenth Amendment, and to be free from retaliation for engaging in constitutionally protected activities. *Id*. p. 9. Additionally, plaintiffs request the court grant them declaratory relief by determining that the names and addresses of citizens of the United States are not confidential and that NDOC employees may not prohibit a prisoner from receiving via the mail the names and addresses of citizens without a valid regulation advancing a legitimate penological interest. Further, that defendants Feil and Tupa were not adequately trained by defendants Gutierrez and John/Jane Doe IV-X, and that defendants Whorton and Crawford failed to "adopt, implement or enforce adequate or sufficient regulations, policies or procedures for the training of NDOC employees in their duties and responsibilities in the handling of prisoner mail and correspondence." *Id*.

> **Count II** - Injunctive Relief - plaintiffs request permanent injunctive relief requiring defendant Whorton and his successors, "to adopt, implement and enforce adequate and sufficient regulations, policies and procedures to ensure all NDOC employees involved in any manner in the handling of prisoner mail and correspondence are adequate and sufficiently trained in the constitutional requirements and NDOC regulations, policies and procedures governing and controlling the handling of prisoner mail and correspondence." *Id*.

> **Count III** - Violation of First and Fourteenth Amendment Rights (Damages) - plaintiffs allege that defendants Feil, Perino, Vare, and Cox denied Witherow's First and Fourteenth Amendment rights when defendant Feil censored and refused to deliver to him mail from C. Rodriguez, which included a petition to then governor Kenny Guinn signed by forty-eight non-inmates, without a legitimate penological purpose, and when defendants Perino, Vare and Cox denied plaintiff's grievances. *Id*. p. 10.

> **Count IV and V** - Violation of First and Fourteenth Amendment Rights (Damages) - plaintiffs allege that defendants Feil, Chacon, Palmer, and Cox denied their First and Fourteenth Amendment rights when defendant Feil "between November 7, 2005 and November 20, 2005 censored and refused to deliver to plaintiff Witherow mail from plaintiff[s] Sikorski [and Dittmer] and returned that mail to plaintiff[s] Sikorski [and Dittmer] without notice or an opportunity to appeal the censorship decision, and when defendants Chacon, Palmer, and Cox denied Plaintiff Witherow any relief in the grievance process."

*Id*. p. 10-12.

**Count VI** - Violation of First and Fourteenth Amendment Rights (Damages) - Witherow alleges that defendants Carey, LeGrand, Palmer, and Cox denied his First and Fourteenth Amendment rights when defendants Carey and LeGrand censored and refused to deliver mail from Connie Sager to Witherow on February 27, 2006, and when defendants LeGrand, Palmer, and Cox denied Witherow's grievances. *Id*. p. 12.

**Count VII** - Violation of First and Fourteenth Amendment Rights (Damages) - Plaintiffs allege that defendant Tupa violated Witherow's First and Fourteenth Amendment rights when she "censored and refused to deliver to plaintiff Witherow mailed from Pat Hines and when she returned that mail to Pat Hines without notice or an opportunity to appeal the censorship decision." *Id*. p. 13.

**Count VIII** - Violation of First and Fourteenth Amendment Rights (Damages) - Plaintiffs claim that defendants Feil, Chacon, Vare, and Cox violated Witherow's First and Fourteenth Amendment rights when defendant Feil retaliated against Witherow for using the grievance and judicial process, and when defendants Chacon, Vare, and Cox denied Witherow's grievances. *Id*.

**Count IX** - Violation of First and Fourteenth Amendment Rights (Damages/Failure to Train) - Plaintiffs contend that defendants Gutierrez and John/Jane Doe IV-X violated plaintiffs' First and Fourteenth Amendment rights when they "failed to adequately or sufficiently train Defendants Feil and Tupa in their duties and responsibilities as mail room officers and in the handling of prisoner mail and correspondence." *Id*. p. 14.

**Count X** - Violation of Constitutional First and Fourteenth Amendment Rights (Damages/Failure to Adopt Training Procedures) - Plaintiffs assert that defendants Whorton and Crawford violated plaintiffs' First and Fourteenth Amendment rights when they "failed to adopt, implement and enforce adequate and sufficient regulations, policies and procedures for the training of NDOC employees in the constitutional requirements of NDOC regulations, policies and procedures governing and controlling the handling of prisoner mail and correspondence and their duties and responsibilities as mail room officers." *Id*. p. 14-15.

Plaintiffs also request punitive damages. *Id*. p. 15.

**B.     Factual Background**

Based on plaintiffs' First Amended Complaint (#61), defendants' answer (#69), the pending motion for summary judgment (#s 78, 80, 82), opposition (#86), and reply (#90), and the pending motion for partial summary judgment (#77), opposition (#81), and reply (#85), and all exhibits attached to these documents, the following facts are undisputed and supported by

3

1  evidence:[1]

2              **1.      Petition (Count III)**

3          1. On December 28, 2004, defendant Feil opened and visually scanned a piece of

4  incoming, general mail, which was addressed to Witherow. Feil described the mail as a "Petition

5  for recommendations regarding parole & sentencing procedures," (the "Petition") and issued an

6  "unauthorized mail notification" to Witherow (#78, p. 3, D-MSJ 916, #86, p. 3).

7          2.   On December 28, 2004, Witherow filed an informal grievance, appealing the

8  unauthorized mail notification (Grievance No. 2004-19-8297). Witherow claimed that his

9  receiving the Petition would not violate NDOC rules and regulations, and that Feil's refusal to

10  deliver the Petition violated his First and Fourteenth Amendment rights, among others. Witherow

11  requested the name and address of the sender of the Petition. On January 10, 2005, defendant

12  Perino denied the informal grievance. She stated: "It is within the guidelines of AR 750 and NRS

13  209.365 to protect the citizens of the State of Nevada from their names and addresses being used

14  in an inappropriate manner. This [P]etition...should have been turned in to the Parole Board...The

15  citizens named give no indication that their names were written down with the intent of being

16  reviewed by you or anyone else except the governing body that would rewrite law" (#78, D-MSJ

17  917-919)

18          3. On January 19, 2005, Witherow filed a first level appeal, in which he claimed defendant

19  Perino's response was "inaccurate and incorrect." He stated that his Constitutional rights were

20  being violated and that no specific provisions of AR 750 or the Nevada Revised Statutes

21  prohibited him from having the names and addresses, because this information is public.

22  Defendant Vare again denied this grievance, reiterating that "there is no indication that there is

23

24  _____

25          [1]The court notes that defendants set out a "Concise Statement of Facts not Genuinely in Issue" in their motion for summary judgment (#78, p. 2-14). In their opposition, plaintiffs responded to this "Concise Statement," disputing numerous of the facts (#86, p. 2-9). Plaintiffs also added

26  additional facts to their "Statement of Material Facts." *Id*. p. 9-12. In their reply, defendants responded to plaintiffs' disputes (#90, p. 1-11). Defendants also discussed plaintiffs' additional facts.

27  *Id*. p. 11-14. The parties also set out additional facts in the motion for partial summary judgment (#77), opposition (#81), and reply (#85). The court will discuss these facts and analyze whether there

28  is indeed a factual dispute within the factual background section.

permission granted for this and the citizens have an expectation that their signature will be forwarded to the governing body for which they were intended." *Id*. D-MSJ 920-923.

4. Witherow then filed a second level grievance on January 31, 2005, arguing that the fact that the Petition was mailed to him indicates that the signatories consented and intended to have the Petition sent to Witherow.  Finally, on February 22, 2005, defendant Cox again denied the grievance. (*Id*. p. 3, D-MSJ 924-927; #86, p. 3; #90, p. 2).[2]

5. On April 4, 2005,the Petition was mailed to then Governor Kenny Guinn (#78, D-MSJ 717-718). The envelope containing the Petition also contained the following documents: (a) a two-page document, entitled, "TO THE GOVERNOR AND LEGISLATURE OF THE STATE OF NEVADA <u>RECOMMENDATIONS REGARDING PAROLE AND SENTENCING PROCEDURES</u>" (emphasis in original); and (b) three pages containing the signatures and addresses of forty-eight Nevada citizens (non-inmates) (#78, p. 4; D-MSJ 712-716).[3]

## 2. Lammers/Lader Letter (Count VIII)

1. On July 7, 2005, defendant Feil opened and visually scanned an article of incoming general mail addressed to Witherow. The mail contained a letter from a Rebecca Lammers, in which Lammers requested Witherow's advice regarding another inmate, Philip Lader's, legal

---

[2]Plaintiffs dispute the dates that defendants set out to describe the grievance period (#86, p. 3). However, as defendants point out, they were referring to the dates that Witherow submitted his grievances, and plaintiffs were referring to the dates on which defendants responded. This is not a genuine dispute. Both parties set out relevant dates. Defendants also dispute the "validity and veracity of the grievance responses provided by Perino and Vare" (#86). However, defendants did not discuss the validity or veracity of the grievance responses. They merely set out what the responses said, as was self-evident by the responses themselves (#78, D-MSJ 919, 923).

[3]Defendants dispute that the "unauthorized mail notification" was not also sent to Governor Guinn. They state: "The envelope addressed to the Governor also contained a copy of the December 28, 2004 Unauthorized Mail Notification signed by Defendant Feil when Witherow left the office of Defendant Carey" (#86, p. 4). However, the evidence demonstrates that the only two documents recovered from the state archives are those described above (#78, D-DEC 006). Witherow states that he cannot recall whether defendant Carey sealed the envelope after placing the documents, including the unauthorized mail notification in it (#86-2, ex. 15). Plaintiffs have not presented evidence that the envelope mailed to the governor contained the notification. Therefore, because the unauthorized mail notification was not found in the state archives with the other documents, it is reasonable for the court to assume that it was never sent.

claims ("Lader" letter or "Lammers/Lader" letter). Lammers attached a letter from Lader's attorney and a Nevada Supreme Court decision regarding Lader's case (#78, D-MSJ 725-729).[4]

2. On July 8, 2005, defendant Feil issued Witherow a notice of charges, in violation of AR 700, 722, 724, as it appeared that he was helping an inmate in another institution with his legal work. Witherow stated at his hearing that he was not doing legal work for Lader, and that he cannot control what another person sends him in the mail. The charges against Witherow were dismissed (#78, D-MSJ 719-722).

### 3.     Scarborough Letter (Count VIII)

1. On or about August 29, 2005, an unknown LCC mail worker[5] opened and visually scanned an article of incoming general mail addressed to Witherow. The mail worker issued an Unauthorized Mail Notification form to Witherow, in which he or she described the mail as "A letter from inmate to inmate from Scarborough" ("Scarborough letter") (#78, D-MSJ 885). On

---

[4]Plaintiffs dispute that defendants refer to the letter from Lammers as the "Lader letter" because it was not actually sent by Lader. This is not a factual dispute. It is inconsequential whether the letter is referred to as the "Lammers" or the "Lader" letter. The letter and its attachments were submitted to the court, and it is apparent that had Witherow replied to Lammers' letter, she would have passed this information on to Lader. Plaintiffs also dispute whether the letter violated the provisions of AR 700, 722, and 724, as defendant Feil wrote in the notice of charges. However, in the statement of facts, the issue is not whether the letter actually violated these provisions, but whether defendant Feil wrote such on the notice of charges. As is plainly apparent by the notice, defendant Feil stated that she based her decision to file a notice of charges on these provisions (#78, D-MSJ 730).

[5]Defendants claim that the unknown mail worker was not defendant Feil (#78, p. 6). Plaintiffs dispute that defendants do not know who the mail worker is. They state that LCC has only one full time mail room officer and that defendant Feil was the assigned LCC mail room officer on August 29, 2005. Because defendants have not identified this unknown mail worker, plaintiffs claim that "[t]he permissible inference is that Defendants are concealing the identity of this allegedly unknown person because that person would contradict the testimony of Feil" (#86, p. 5). Defendants state that "[t]his issue was vetted in discovery, and the identity of the worker, whether a temporary or relief worker, was not sufficiently established by Plaintiffs. The negative inference suggested by Plaintiffs is improper and based on speculation, and would be inadmissible at trial for that reason" (#90, p. 5). The court agrees that this inference is based on defendants speculation, and is therefore improper. Defendants have presented no evidence that defendants are concealing the identity of this mail room worker. Additionally, the court notes that plaintiffs refer to this unknown worker as "Felia" in their complaint. However, they do not name "Felia" as a defendant, but allege that he or she acted based on defendant Feil's instructions.

1  August 30, 2005, Witherow sent an "inmate request form" to the mail room officer in which he

2  requested the correct spelling, return address of the sender, and the institution in which the person

3  is confined. Defendant Feil sent Witherow the name and return address. Witherow requested that

4  the letter be sent to his attorney or returned to the sender. Defendant Feil responded that the letter

5  was inmate-to-inmate piggybacked, and was now contraband (#78, D-MSJ 886-887). Witherow

6  did not file a grievance about this unauthorized mail notification or the withholding of the

7  Scarborough mail, and no disciplinary charges were brought against him (#78, p. 7; #86, p. 5).

8        2. The Scarborough mail was a letter to Witherow from someone named Chris, who

9  identified himself as another inmate in NDOC (#78, D-MSJ 884). It appears that Chris sent the

10  letter to his mother in Massachusetts, who then sent it to Witherow. He also asked Witherow to

11  send his response to his mother's address, rather than directly to him. *Id*. D-MSJ 883 ("My mom

12  is moving back to Massachusetts as I write. The address to respond to is on the return on the

13  envelope"); D-MSJ 884 ("Oh, if you need a first initial for the return name, it's J.") The purpose

14  of the letter was to seek legal advice and assistance from Witherow. *Id*. D-MSJ 883 (discussing

15  his medical problems and electricity failure issues at the prison and asking Witherow if he would

16  be interested in helping him bring suit against NDOC).

17              **4.        Varnum - Returned Mail (Count VIII)**

18        1. On September 19, 2005, defendant Feil opened and visually scanned an article that had

19  been returned to Witherow by the U.S. Postal Service as undeliverable. Witherow had asked the

20  addressee, a Jackie Varnum, to give newspaper clippings to another NDOC inmate, Joseph

21  Maresca, which Witherow thought might pertain to his case (#78, p. 8; D-MSJ 735, 738).

22        2. On September 20, 2005, defendant Feil issued a notice of charges against Witherow for

23  "piggybacking a letter to another inmate [which] is a blatant violation of AR 750 (#78, D-MSJ

24  735).

25        3. The hearing officer dismissed the charges against Witherow, finding that "such a relay

26  of information did not meet [the] requirement for inmate-to-inmate correspondence" (#78, p. 8).

27        4. On October 24, 2005, Witherow filed an informal grievance (Grievance No. 2005-19-

28  12643) against defendant Feil, alleging that Feil had retaliated against him "through unwarranted

and unfounded disciplinary reports in matters related to my mail...." Witherow went on to explain that "the problem with C/O Feil began on 12/28/04 when she wrote an Unauthorized Mail Notification" based on the Petition. Witherow claimed that defendant Feil "has since embarked on a campaign to retaliate against me for engaging in those constitutionally protected activities by writing unfounded and unwarranted disciplinary charges against me. Since that time she has written 3 major and 1 general disciplinary charges against me. There was no factual basis for any of those disciplinary charges and she only wrote those disciplinary charges against me to retaliate and punish me for writing the above referenced grievance and for sending the Petition and Unauthorized Mail Notification to the Governor" (#78 D-MSJ 871-873). Defendant Chacon replied to Witherow's grievance on October 27, 2005. She informed him that he needed to attach "All documents & factual allegations available to [him]," pursuant to AR 740, 1.4.1.5, as defendant Chacon did not have details of Feil's charges, but only of Witherow's complaints against her. *Id.* D-MSJ 874. She also stated that "the evidence does not indicate that C/O Feil is violating or has violated your 1st Amendment rights nor that she has embarked upon a campaign to retaliate against you. She is simply conducting her duties as outlined in her job description." *Id*.

5. Witherow then filed a first level grievance, in which he reiterated his retaliation allegations. Witherow again did not attach any supporting documents, but stated that the "NOC are in NDOC I-File on me and the original of the records are available to staff in the grievance process." *Id*. D-MSJ 875. Defendant Vare denied the first level grievance on November 9, 2005, because Witherow did not provide the required documentation, and because there was no evidence of retaliation. *Id*. D-MSJ 876. The second level grievance was also denied.[6] *Id*. D-MSJ

---

[6]Plaintiffs dispute whether AR 740.02 § 1.4.1.5 requires Witherow to attach the documentation. They also argue that "Defendants waived any objection to the alleged lack of documentation by addressing the merit of the retaliation claim" (#86, p. 6). Plaintiffs cite no authority to support their contention that under these circumstances, defendants' act of addressing both the substantive merits of a retaliation claim as well as a procedural defect somehow results in a waiver of their right to again argue the procedural defect in the motion for summary judgment. Parties often make both procedural and substantive arguments regarding an issue. Defendants did not waive their right to object to the lack of documentation by addressing the merits of the retaliation

877-79.

### 5.      Sikorski/Dittmer Unopened Mail (Counts IV and V)

1. On about November 15, 2005, defendant Feil returned mail from plaintiffs Sikorski and Dittmer. The envelopes were not opened, and defendant Feil noted that the mail was "unauthorized correspondence," and "refused" because "tape [is] unauthorized," which was found on the outside of the envelopes (#78, D-MSJ 906-907). Witherow was not given notice that this mail was returned to the senders unopened. *Id*., D-MSJ 899. However, Witherow first discovered on December 18, 2005 that this mail had been returned (#86, p. 9).

2. Witherow filed an informal grievance regarding the return of the Sikorski and Dittmer mail on December 18, 2005 (Grievance No. 2005-19-15552). He objected to the fact that he had not been given notice or an opportunity to appeal the decision to return the mail. He argued that AR 750 required that such process be given to him. *Id*. D-MSJ 897-98. Defendant Chacon denied Witherow's grievance, but noted that "Per AR 750, you should have been notified by the Mail Room with a DOC-1518, informing you that Unauthorized Mail was received at LCC and returned to sender. Your mail was returned to sender through the U.S. Mail without being opened. The mail in question was considered 'Adulterated' and the only option you would have had, had you been afforded the opportunity, would be to send it out or have it destroyed. The Mailroom officer's failure to follow or know all of the proper procedures can't be construed as an 'illegal activity' or a purposeful 'violation of your Constitutional Rights.' LCC has addressed the issue and will do everything to prevent this from occurring again."[7] *Id*. D-MSJ 899.

3. In Witherow's First Level Grievance, he claimed that he was entitled to some recourse

---

claim.

[7]The court notes that defendants have since changed their position on whether, under AR 750, prison officials are required to give notice and an opportunity to appeal a mail officer's decision to return unopened mail (#78, p. 11). They now argue that the "Unopened Mail Policy would have allowed for the return of the Sikorski and Dittmer Mail without issuing an 'unauthorized mail' notice to Witherow." *Id*. Additionally, the Unopened Mail Policy has since been codified as LCC Operation Procedure 750.01 § 7. *Id*. p. 10. Plaintiffs dispute whether any such policy existed at the time Sikorski and Dittmer's letters were returned. The court will address this issue in more detail in its analysis of counts IV and V.

as LCC officials admitted that they violated AR 750. He also argued that placing tape on an article of mail is not an adulteration as defined by AR 750. *Id*. D-MSJ 900-01. Defendant Palmer again denied the grievance and set out the definition of adulterated mail. *Id*. D-MSJ 902. Witherow's grievance was again denied at the second level. *Id*., D-MSJ 903-05.

### 6.      Hines Mail (Count VII)

1. LCC received a letter from a Pat Hines ("Hines" Mail) on or about February 13, 2006 (*see* #78, D-MSJ 913 - postmarked date). Defendant Tupa[8] returned this letter to the sender unopened because it contained an address label sticker on the envelope, and she wrote "No Stickers" on the envelope. Defendant Tupa did not issue an Unauthorized Mail Notification to Witherow (#78, p. 12).[9] Witherow first learned on April 12, 2006 that this mail had been returned (#86, p. 9; #90, p. 11).

2. On April 18, 2006, Witherow filed an informal grievance regarding the return of the Hines mail. He argued that he should have been afforded notice and an opportunity to appeal before the mail was returned, pursuant to AR 750. He also complained of the training and supervision of the mail room personnel (#78, D-MSJ 909-910). On May 3, 2006, Caseworker Carla Van Pelt responded to Witherow's grievance, stating that the Hines mail was returned due to safety and security concerns because of the sticker placed on the envelope. She also noted that

---

[8]Plaintiffs also state additional facts regarding their attempts to find out the identity of defendant Tupa and their eventual substitution of defendant Tupa (#86, p. 10, ¶s 10-12). The court has omitted these, as it is clear that plaintiffs name defendant Tupa in the Seventh Cause of Action.

[9]The parties dispute the reason why defendant Tupa returned the mail and did not issue an Unauthorized Mail Notification. Defendants argue that Tupa returned the mail unopened because the address sticker made it "adulterated mail," especially in light of the fact that Witherow's address was hand written on the label, making the label unnecessary, and giving rise to security concerns. She did not issue the Notification to Witherow because she was acting in reliance on the "Unopened Mail Policy," which did not require her to issue such Notification (#78, p. 12; #90, p. 9). Plaintiffs argue that mailing labels do not make envelopes "adulterated mail," as defined by AR 750, and the "decision defining mailing labels as adulterated mail was arbitrary...." They also claim that there was no "Unopened Mail Policy," and "the unwritten, unapproved and unpublished "policy" authorizing the return of mail to sender without notice and an opportunity to appeal was [an] arbitrary invasion and violation of Plaintiffs' First and Fourteenth Amendment rights and of clearly established law" (#86, p. 8).

she agreed with Witherow that AR 750 was violated when no Unauthorized Mail Notification was sent to the inmate. She stated that she would send a copy of the grievance to higher authorities to ensure mail room officers adhere to AR 750.[10] It appears that Van Pelt did pass the grievance along to defendant Le Grand, as there is a handwritten note on her response, which reads: "Mail officers have been sending letters with stickers and lipstick back to sender as a courtesy to the I/Ms and save them a stamp, but as Witherow points out, it violates AR 750." *Id.*, D-MSJ 910-912. Witherow filed no further grievances.[11] It is unclear whether defendant LeGrand ever followed up with Van Pelt or Witherow.

### 7.    Sager Mail (Count VI)

1. On February 27, 2006, defendant Carey opened and visually scanned an article of incoming legal mail to Witherow from a Connie Sager ("Sager" Mail). The mail contained legal documents of another inmate, where the names on the documents were blacked out, but still visible (#78, D-MSJ 888, 893). Defendant Carey issued an Unauthorized Mail Notification against Witherow and sent the article of mail to defendant LeGrand to approve or disapprove. *Id.*, D-MSJ 888.

2. On February 28, 2006, Witherow filed an informal grievance (Grievance No. 2006-19-3251) against defendant Carey for withholding the mail, which he claimed violated his constitutional rights. *Id.* D-MSJ 889-891. Defendant LeGrand responded to this grievance on March 1, 2006, stating that the mail was unauthorized because an inmate may not possess another

---

[10]As they did previously with regard to defendant Chacon, defendants now reject the opinion of the caseworker, Van Pelt, that Witherow was entitled to receive notice and an opportunity to appeal pursuant to AR 750. They claim that, in hindsight, these statements were "mistakenly given in error because the Unopened Mail Policy would have allowed for the return of the Hines Mail without issuing an "unauthorized mail" notice to Witherow" (#78, p. 13; #96, p. 9). Plaintiffs again dispute the existence of such a policy (#86, p. 8).

[11]The parties dispute whether Van Pelt denied or upheld Witherow's grievance. Plaintiffs argue that Van Pelt upheld plaintiff's grievance because she agreed that AR 750 was violated. Therefore, Witherow "prevailed on his grievance and there were no procedures available to him in AR 740 to appeal the issues further" (#86, p. 8). Defendants position is that the grievance was denied because "[i]t cannot be disputed that the first message disagrees with Witherow's grievance, and, hence is a denial of that portion of Witherow's grievance. He was required to exhaust that portion of his grievance, which he failed to do" (#96, p. 9).

inmate's legal work if the inmates are not in the same institution (among other requirements).
Further, the "documents contained sensitive information about another inmate's crime. These
documents are considered contraband and are prohibited by AR 722." *Id*., D-MSJ 891.

3. Witherow then filed a first level grievance on March 15, 2006. He argued that he was
not violating AR 722 because the documents were sent to him by Sager, a free citizen, and not
by another inmate. He also claimed the inmate to whom the documents pertained ("Dickinson")
was not a Nevada inmate. *Id*. D-MSJ 892. Defendant Palmer again denied Witherow's grievance,
stating that Dickinson was a Nevada inmate, and that possessing another inmate's legal
documents was a violation of AR 722. *Id*. D-MSJ 893.

4. Witherow filed a second level grievance on March 27, 2006, arguing that information
pertaining to another inmate's crime is public record and not confidential, and there is no
regulation which prohibits him from having it. Defendant Cox again denied the grievance, and
stated:"The department will not allow you to have other inmate's legal materials or information
about their crime, except as authorized by AR 722 or a court order." *Id*. D-MSJ 894-896.[12]

## II.  DISCUSSION & ANALYSIS

### A.    Discussion

#### 1.  Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual
disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th
Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in
dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(C).
In deciding whether to grant summary judgment, the court must view all evidence and any
inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi
v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed
> matters of professional judgment.  In respect to the latter, our
> inferences must accord deference to the views of prison

---

[12]The court notes that a discussion of plaintiffs additional facts regarding Feil's and Tupa's
training is included in the discussion of causes of action IX and X.

1
2

> authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

3 *Beard v. Banks*, 548 U.S. 521, 526, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could

4 differ on the material facts at issue, however, summary judgment should not be granted.

5 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

6       The moving party bears the burden of informing the court of the basis for its motion, and

7 submitting evidence which demonstrates the absence of any genuine issue of material fact.

8 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden,

9 the party opposing the motion may not rest upon mere allegations or denials in the pleadings but

10 must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson*, 477

11 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for

12 discovery, against a party who fails to make a showing sufficient to establish the existence of an

13 element essential to that party's case, and on which that party will bear the burden of proof at

14 trial.  *Celotex*, 477 U.S. at 322-23.

15         **2.**    **Prisoners' General Constitutional Rights**

16       "'Lawful incarceration brings about the necessary withdrawal or limitation of many

17 privileges and rights, a retraction justified by the considerations underlying our penal system.'"

18 *Sandin v. Connor*, 515 U.S. 472, 485 (1995), citing *Jones v. North Carolina Prisoners' Union*,

19 433 U.S. 119, 125 (1977) and quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948); *see also Shaw*

20 *v. Murphy*, 532 U.S. 223, 229 (2001) ("the constitutional rights that prisoners possess are more

21 limited in score than the constitutional rights held by individuals in society at large.")

22       However, "prison walls do not form a barrier separating prison inmates from the

23 protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), "nor do they bar free

24 citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'"

25 *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Nevertheless, these right must be weighed with

26 "due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id.*

27 at 407 quoting *Turner*, 482 U.S. at 85. Prison officials must weigh the need for internal order and

28 security against the rights of prisoners and those on the outside who seek to communicate with

such prisoners. *Id.*

### 3.	First Amendment Rights - Inmate Correspondence

Generally, prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curium). However there must be a "delicate balance" between prisoners' First Amendment rights and the discretion given to prison administrators to govern the order and security of the prison. *Thornburgh*, 490 U.S. at 407-08. Prison officials have more leeway to regulate incoming than outgoing mail because of the greater security risks inherent in materials coming into a prison. *Id.* at 413. *Turner* is applicable to regulations and policies regarding all incoming mail; therefore, regulations and policies involving incoming mail are "valid if [they] are reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

*Turner* sets out a four-part test which governs prison policies and regulations concerning incoming mail: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the rights that remain open to prison inmates"; (3) what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and, (4) whether the "absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 89-90. As to the first element of the test, the *Turner* court found that in the First Amendment context it is important to inquire whether the restriction operate in a "neutral fashion, without regard to the content of the expression." *Id.* at 90.

The *Turner* test applies to the constitutional rights of both the inmates and the outsiders who communicate with them. *See Thornburgh*, 490 U.S. at 411, n. 9 ("[a]ny attempt to forge separate standards for cases implicating the rights of outsiders is out of step [with cases in between *Martinez* and *Turner*], which all involved regulations that affected the rights of prisoners and outsiders."). Finally, the court stated in *Turner* that prison officials may entirely prohibit correspondence between inmates based on security concerns. *Turner*, 482 U.S. at 92-3.

///

### 4.      Fourteenth Amendment Right to Due Process

The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally-protected liberty interest is at stake. *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1995), citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Liberty interests can arise both under the Constitution and from state law. *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974).

With respect to liberty interests created under the Constitution, the Court has held that prisoners have a Fourteenth Amendment liberty interest in "uncensored communication by letter," although this interest is "qualified by necessity by the circumstances of imprisonment." *Martinez*, 416 U.S. at 417-18; *see also Frost v. Symington*, 197 F.3d 348, 353 (9th Cir. 1999) (prisoner have a "Fourteenth Amendment due process liberty interest in receiving notice that...incoming mail is being withheld by prison authorities"), citing *Thornburgh*, 490 U.S. at 406. This liberty interest is protected from "arbitrary government invasion," and any decision to censor or withhold delivery of mail must be accompanied by "minimum procedural safeguards." *Martinez*, 416 U.S. at 418. The Court in *Martinez* noted that the following minimum procedures were required: (1) notifying the inmate of the rejection of a letter; (2) allowing the author of the letter a reasonable opportunity to protest the decision; and (3) referring any complaints to a prison official other than the person who made the censorship decision. *Id*. at 418-19. The Ninth Circuit "has repeatedly acknowledged that withholding delivery of inmate mail must be accompanied by the minimum procedural safeguards" established in *Martinez*. *Krug v. Lutz*, 329 F.3d 692, 697-98 (9th Cir. 2003), citing *Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir. 2002) and *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001).

Regarding state-created liberty interests, the Supreme Court has held that states may under some circumstances create liberty interests protected by the Due Process clause, but that those liberty interests "will be generally limited to freedom from restraint which...impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

///

15

### B.       Analysis

Defendants move for summary judgment on all causes of action (#78). Plaintiffs move for summary judgment on the first, third, fourth, fifth, sixth, seventh causes of action. They state that the "issues of liability of claims alleged in the...Eighth, Ninth and Tenth Causes of Action and the amount of monetary damages should be reserved for determination by the trier of fact at trial" (#77, p. 2).[13]

### 1.       Third Cause of Action - The Petition

Defendants contend they are entitled to summary judgment on plaintiffs' third cause of action because Witherow does not have a First Amendment right to mail the Petition because the forty-eight signatories did not signal their intent to communicate with Witherow, a convicted prisoner, simply by signing the Petition. Defendants acknowledge that the "First Amendment protects the flow of information to prisoners, and any limitation must reasonably relate to a legitimate penological interest (#78, p. 17). However, defendants argue that the free-flow of information to Witherow is not implicated "by the Signatories' mere signing of the Petition, because the Signatories did not 'seek out' communication with Witherow; rather, the Petition was merely forwarded to Witherow by a third-party." *Id*. Even assuming Witherow had a First Amendment right to the Petition, defendants' decision to withhold the Petition were rationally related to a legitimate penological interest. *Id*. p. 18-20. Finally, defendants are entitled to qualified immunity. *Id*. p. 20.

Plaintiffs ask for summary judgment because Witherow had a right to receive the Petition, since the "signatories of the [P]etition voluntarily placed their names and addresses in the public record when they signed the [P]etition;" therefore, these names and address are public information, which "are not declared confidential by law" (#86, p. 14; #77, p. 13 ("The reason provided for the refusal to claim the mailed [P]etitions to Witherow was that the names and addresses of citizens are confidential. There is no statute, regulation, or other law declaring the names and addresses of citizens confidential.")). Further, the sender of the Petition clearly

---

[13]Plaintiffs do not discuss the second cause of action. Therefore, the court assumes that their motion (#77) does not include it.

intended to deliver the Petition to Witherow, and there is no evidence that Witherow intended to use the information in an inappropriate manner. *Id*. "There was no legitimate reason for not delivering that mailed [P]etition to him" (#77, p. 13). Additionally, plaintiffs argue that because there is no prison rule or regulation prohibiting Witherow from receiving or possessing the names or addresses of private citizens, it is unnecessary to perform a *Turner* analysis on the validity of a prison regulation. *Id*. Rather, "the analysis to be conducted is whether there was an arbitrary government invasion of constitutional rights." *Id*. p. 15. Additionally, defendants are not entitled to qualified immunity because Witherow has a clearly established right to receive and possess public record information.

Defendants reply that just because the signatories of the Petition voluntarily placed their names and addresses in the public record does not automatically mean that it is proper to show this particular information to an inmate (#90, p. 18). Defendants withheld the Petition "based on the security concern that the public might have unwittingly set itself up for abuse or impropriety by NDOC inmates. Protecting persons from abuse and harassment is a legitimate government interest" (#81 p. 22). Further, it is immaterial whether Witherow intended to use the information in an inappropriate manner. "Otherwise, inmates could engage in dangerous conduct, on the theory that they had not yet been caught." *Id*.

"It is well settled that the First Amendment protects the flow of information to prisoners; any limitation must reasonably relate to a legitimate penological interest." *Crofton v. Roe*, 170 F.3d 957, 959 (9th Cir. 1999). To determine whether a prison regulation or action is reasonably related to a legitimate penological interest, courts apply the four-part *Turner* analysis, as set forth in the legal background section above.[14] Defendants first argue that Witherow has no First

---

[14]Plaintiffs claim that a *Turner* analysis is inappropriate here because "[t]here is no prison rule or regulation prohibiting or restricting Witherow from receiving or possessing the names or addresses of citizens" (#86, p. 14-15). Rather, plaintiffs contend that the appropriate analysis is whether there is an arbitrary government invasion of constitutional rights, as stated in *Procunier v. Martinez*. *Id*. p. 15. The court does not fully understand this argument. *Turner* itself states that courts will step in when "a prison regulation *or practice* offends a fundamental constitutional guarantee." *Turner*, 482 U.S. at 84, quoting *Martinez*, 416 U.S. at 405-06 (emphasis added). Here, plaintiffs ask the court to declare as unconstitutional the prison's practice of not allowing personal information of

Amendment right to the Petition because there is no evidence that the signatories intended to communicate with Witherow specifically. Plaintiffs state that because the names and addresses are public information and the sender of the Petition intended the Petition to be delivered to Witherow, he has a First Amendment right to this information. The court disagrees. If the signatories were unaware that the Petition would be sent to Witherow,[15] a prisoner, it is irrelevant whether the person who sent the Petition intended for Witherow to have this information.[16]

---

non-inmates to be sent to inmates where the former have not expressly authorized such. This is precisely what *Turner* authorizes courts to do and what the *Turner* factors were meant to address. Therefore, a *Turner* analysis is appropriate in this case. Further, even if the court were to only assess whether prison officials acted arbitrarily in not giving the Petition to Witherow, plaintiffs have not presented evidence that defendants' decisions and actions were arbitrary. Defendants state that they intended to protect the forty-eight signatories to the Petition by not giving it to Witherow, a convicted inmate, as there was no indication that the signatories intended to have their personal information sent to Witherow, or even that they knew their personal information would be sent to an inmate. They gave Witherow notice of this decision and he was able to appeal it. Witherow and defendants came to an agreement whereby the Petition was forwarded to the Governor, who would have been its ultimate recipient whether it was Witherow or defendants who sent the Petition. Therefore, defendants actions were not an arbitrary invasion of Witherow's First Amendment rights.

[15]In their motion for partial summary judgment, plaintiffs state that Witherow "drafted and caused to be printed and circulated a Petition to the Nevada Governor and Legislator of Recommendations Regarding Parole and Sentencing Procedures and an Instruction Sheet to accompany that Petition requiring the Petition to be returned to the person that provided the Petition after signatures had been obtained" (#77, p. 5, ex. 1, ¶s 8-9; ex. 4). However, this statement does not demonstrate that the instruction sheet was actually circulated with the Petition. Further, the instruction sheet does not inform the signatories that Witherow was the "person that provided the Petition" or of his status as an inmate.

[16]The court finds unpersuasive and inapplicable the law plaintiffs cite for the proposition that Witherow is entitled to ALL information that is "public record information that is not declared confidential by law" (#85, p. 13). Nev. Rev. Stat. § 239.010(1) states that "all public books and public records of a governmental entity, the contents of which are not otherwise declared by law to be confidential, must be open at all times during office hours to inspection by any person, and may be fully copied or an abstract or memorandum may be prepared from those public books and records...." This statute is not applicable here. No public books or records of a governmental entity are at issue. Both *Nixon v. Warner*, 435 U.S. 589 (1978), and *Phoenix Newspaper v. U.S. Dist. Court*, 156 F.3d 940 (9th Cir. 1998) are related to the public's right to have access to public court records and to criminal trials. Again, neither of these cases is applicable here because there is no criminal trial or public court records at issue. *Clements v. Cal. Dep't. Of Corrections*, 364 F.3d 1148, upheld the district court's finding that a total ban on all mail containing any material printed from the internet was unconstitutional. The court discussed a prisoner's general First Amendment rights. However, that court specifically stated that "[t]his First Amendment right is operative unless it is

18

1    Even if Witherow did have a First Amendment right to the signatures and address

2 information, defendants demonstrated that the limitation is reasonably related to a legitimate

3 penological interest. First, there is a "'valid, rational connection' between the prison regulation

4 and the legitimate governmental interest put forward to justify it." The governmental interest

5 defendants present is the protection of the forty-eight signatories. The withholding of the Petition

6 is rationally related to this interest. Second, there are "alternative means of exercising the rights

7 that remain open to prison inmates." Witherow can solicit signatures for a petition and receive

8 personal information from private citizens if he discloses that the names and addresses of the

9 signatories will be sent to a prisoner. Third, "accommodation of the asserted constitutional right

10 will have [a significant impact] on guards and other inmates, and on the allocation of prison

11 resources generally." The court agrees that there is cause for concern of a "ripple effect" that

12 could strain prison resources in having to police whether information was being used innocently

13 or with ill intent. *See Frost*, 197 F.3d at 358. Fourth, defendants have presented no alternatives

14 to the policy of not allowing an inmate the names and addresses of private citizens without

15 express, informed consent of the signatory. *Turner*, 482 U.S. at 89-90. Therefore, because the

16 *Turner* elements are met, defendants' motion for summary judgment is granted as to the third

17 cause of action.

18        **2.        Fourth and Fifth Causes of Action - Sikorski/Dittmer Unopened Mail**

19    Defendants assert that they are entitled to summary judgment on the fourth and fifth

20 causes of action because they properly returned unopened mail to defendants Sikorski and

21 Dittmer, and were not obligated to give defendant Witherow notice of their actions or an

22 opportunity to appeal (#78, p. 20). Administrative Regulation 750 does not create a liberty interest

23 to any procedural protections when mail is returned unopened. Defendants argue that the

24 "Unopened Mail Policy" is now codified at OP 750 and that the return of unopened mail for

25

26 _____

27 'inconsistent with [a person's] status as a prisoner or with the legitimate penological objectives of
the corrections system," and discusses the *Turner* factors in relation to the prison policy at issues.

28 Again, this case does not stand for the proposition that inmates are entitled to possess any and all
public record information.

19

1   various security reasons is rationally related to a legitimate penological interest. *Id*. p. 20-22.

2   Defendants also contend that even assuming a right-of -notification does exist, defendants would

3   still prevail under a *Turner* analysis. *Id*. p. 22. Finally, defendants are entitled to qualified

4   immunity. *Id*. p. 23.

5           Plaintiffs' view is that they have "the right to send and receive information to each other

6   by letters and to notice [and] an opportunity to appeal each censorship decision *before* the mail

7   is returned to sender" (#77, p. 14). Additionally, AR 750 does not include an "Unopened Mail

8   Policy;" rather the "Unopened Mail Policy" actually conflicts with AR 750 (#86, p. 16). Further,

9   "*There is no valid, written approved and published policy authorizing the return of mail to sender*

10  *without notice.* A warden does not have the authority to promulgate a policy that conflicts with

11  a prescribed, approved and published mail regulation." *Id*. (emphasis in original). Plaintiffs state

12  that Witherow does not claim a liberty interest under AR 750. They again argue that a *Turner*

13  analysis is not appropriate because the alleged "Unopened Mail Policy" did not actually exist. *Id*.

14  Plaintiffs also contend that defendants are not entitled to summary judgment because plaintiffs

15  "had a clearly established right to notice and an opportunity to appeal the decision to withhold

16  delivery of their mail *before* that mail was returned to sender." *Id*. (emphasis in original).

17          Defendants state that "Witherow's attack on the security and allocation-of-resource

18  considerations underlying AR 750 and the Unopened Mail Policy implicate disputed matters of

19  *professional judgment;*" therefore, the court should accord deference to the views of prison

20  authorities (#81, p. 24-25 and n. 49) (emphasis in original). Defendants argue that under a *Turner*

21  analysis, they did not violate plaintiffs' rights "when they refused to 'accept' from the USPS the

22  Sikorski-Dittmer mail for security concerns." *Id*. p. 25. They also respond that plaintiffs "offer

23  no legal support for the proposition that, '[a] warden does not have the authority to promulgate

24  a policy that conflicts with a prescribed, approved and published mail regulation.'" (#90, p. 18).

25  Finally, "even if returning the Sikorski-Dittmer Mail, and/or doing so without notice, was

26  unconstitutional under *Turner*, any such unconstitutionality was not clearly established or

27  sufficiently defined, given the competing authorities and the context of this case, at the time of

28  the acts, entitling Defendants to have [qualified] immunity..." (#81, p. 27).

1     AR 750 is the principal regulation governing general mail (AR 722 governs legal mail,

2  which is not applicable here). AR 750 defines "general correspondence" as any mail that is not

3  "privileged correspondence." AR 750, definitions, D-MSJ 97. All general incoming mail may be

4  opened and inspected for contraband outside the presence of the inmate, and in all cases where

5  incoming mail is censored, the inmate and the sender are to be notified with the reason for the

6  censorship and given the opportunity to appeal the decision. AR 750.06.1.4, 1.5, 1.7, D-MSJ 984.

7  AR 750 defines censorship as "[t]he intent to suppress or delete anything considered

8  objectionable under this regulation. Censorship may include, but is not limited to: [1] Deleting

9  portions of a letter; [2] Returning the letter either in its entirety or in part to the sender; and, [3]

10  Removing printing or pictures, adulterated mail or rendering any portion of the contents

11  unintelligible." AR 750, definitions, D-MSJ 973. General incoming correspondence may be

12  censored if, among other things, it is found that the correspondence contains threats of criminal

13  activity, addresses introducing contraband into the institution or sending contraband out of the

14  institution, or concerns plans for activities in violation of institutional rules or for criminal

15  activity. AR 750 (V)(E)(1)-(9).  Additionally, if an inmate's name is misspelled and there is no

16  identification number or an incorrect identification number, the mail will be returned unopened

17  to the sender. AR 750.03.1.2.5. AR 750 defines "adulterated mail" as "[i]tems of correspondence

18  or publications that have an unknown substance on it. Adulteration includes, but is not limited

19  to, lipstick, stickers, white out, perfumes, and other unknown foreign substances." AR 750,

20  definitions, D-MSJ 973. With regard to "adulterated mail," AR 750 states that "[a]ny envelope

21  or correspondence, magazine or book that has evidence of adulteration or a foreign substance

22  such as stickers, lipstick, or perfume will not be issued to the inmate." AR 750.03.1.6, D-MSJ

23  981.

24     The court agrees with plaintiffs that when a prison rejects and returns or withholds opened

25  mail to the sender because of the *content* of the mail, the prisoner's and the sender's First

26  Amendment rights are implicated and the prisoner is therefore entitled to the due process

27  procedures set out in *Martinez* ("the decision to censor or withhold delivery of a particular letter

28  must be accompanied by minimum procedural safeguards....an inmate [must] be notified of the

rejection of a letter..., the author of that letter [must] be given a reasonable opportunity to protest that decision, and...complaints [must] be referred to a prison official other than the person who originally disapproved the correspondence." 416 U.S. at 417-418). *See, e.g. Witherow v. Crawford*, 3:01-cv-00404-LRH-VPC, #236, p. 3-4; *see also Frost v. Symington*, 197 F.3d 348 (9th Cir. 1999) (holding that a prisoner has a "due process liberty interest in receiving notice that his incoming [magazines are] being withheld by prison authorities" based on obscenity concerns), *Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir. 2002) (holding that withholding delivery of inmate mail must be accompanied by minimum procedural safeguards), *Prison Legal News v. Cook*, 238 F.3d 1145, 1152 (9th Cir. 2001) (holding that a prisoner has a "constitutionally protected right" to receive a nonprofit organization's newsletter).

However, none of these cases concerned a situation where mail was returned unopened because of perceived defects on the envelope, such as stickers or an incomplete address, as opposed to security concerns raised by the content of the mail. In *Martinez*, the Court struck down prison regulations that authorized "censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise' inappropriate.'" 416 U.S. at 415. The other cases also concern situations in which a prison censors or withholds delivery of mail based on the written content of letters or publications. Witherow's mail was returned unopened due to defects on the envelope, specifically, the tape that was applied to the outside of the envelope, not because of the content of the letters themselves or because any contraband was found inside the envelope. The court finds this situation to be more similar to the facts in *Jeffries v. Snake River Corrections-Oregon*, cited by defendants.

In *Jeffries,* an Oregon Department of Corrections regulation directed officers to first check incoming mail for "noticeable violations" before accepting it into the prison. All mail with noticeable violations was returned to the sender via the United States Postal Service with a sticker notifying the sender of the violation. Inmates were not notified when their incoming mail was returned to sender for a noticeable violation. 2008 WL 3200802 *1 (D. Or. 2008). The court found that the prison's "policy of screening inmates' mail and prohibiting incoming mail

containing stickers or certain adhesives does not violate plaintiff's First Amendment right to receive mail." *Id*. at *4. In reaching this conclusion, the court underwent a full *Turner* analysis. The court stated:

> The state government has a legitimate penological interest in preventing narcotics, such as LSD, from coming into [the prison]. This interest is rationally served by prohibiting mail containing adhesives and stickers, which can facilitate the transmission of narcotics. Furthermore, prohibiting stickers and adhesives on incoming mail does not deprive prisoners of their right to send and receive mail; rather, inmates can still receive mail that is free from contraband adhesives, and senders have the opportunity to resend their letters after correcting the identified violations. Allowing adhesives and stickers to be introduced into the prison would result in adverse effects on guards, other inmates, and prison resources generally, because it would enable inmates to receive mail containing contraband such as narcotics.

*Id*. The court then discussed whether inmates had a right to notice when the prison rejected incoming mail for noticeable violations. The court acknowledged that the lack of notice was frustrating to the inmate, but stated that it was questionable whether an inmate has a First Amendment right to be notified when his mail is rejected for noticeable violations. The court likened the prison's policy of returned mail to the sender without notice to the intended recipient to the "widely accepted U.S. Postal Service practice of not providing notice to intended recipients when ordinary mail is returned for lack of postage or some other technical deficiency." *Id*. at *5.

Although the court did not believe inmates had a right to notice when mail was returned for noticeable violations, it nonetheless went through a *Turner* analysis, assuming that it applied "for the sake of argument." The court discussed the large volume of mail that the prison received, and found that "[p]roviding notice to each inmate recipient for each letter with a noticeable violation would drain already limited resources from security screening of mail that actually enters the institution, heightening chances that contraband may inadvertently be allowed into the prison." *Id*. Further, "[d]espite the lack of notice, plaintiff would still have access to this mail once the sender corrects any deficiencies and re-sends the letter."*Id*. Therefore, because the court concluded that the prison's policy of not providing notice every time a piece of mail is rejected for having a noticeable violation satisfies the *Turner* requirements, it found that the policy did not violate the First Amendment. *Id*.

23

1    Plaintiffs argue that a *Turner* analysis is not applicable in this case because the "Unopened

2    Mail Policy" was not "written, approved, and published" (#86, p. 16). They argue that the alleged

3    policy conflicts with AR 750 and clearly established law, and that "*[a] Turner analysis of the*

4    *alleged Unopened Mail Policy cannot be conducted because that policy did not, in fact, exist.*"

5    *Id.* Further, "[a] *Turner* analysis is not required because Plaintiffs are not challenging the validity

6    of a prescribed, approved and published regulation authorizing the infringement on Plaintiff's

7    constitutional rights" (#85, p. 15) (emphasis in original). As the court previously stated, *Turner*

8    applies to prison regulations, policies, and practices. Both Feil and Tupa believed that tape and

9    stickers on envelopes made it adulterated as provided by AR 750. It appears that even though

10   there was not a written "unopened mail policy," such policy existed in practice, and the mail room

11   workers engaged in complying with such policy. Defendant Vare, the Warden at the time, also

12   confirms the existence of the policy (#78, D-DEC 025). Additionally, the practice of returning

13   mail with noticeable defects on the envelopes without giving notice to the intended inmate

14   recipient does not conflict with AR 750. AR 750 requires notice and an opportunity to appeal

15   when mail is censored. Sikorski and Dittmer's mail was not censored. Further, although tape is

16   not specifically listed in the definition of "adulterated mail," the definition specifically states that

17   the list of examples of adulterated mail provided is not inclusive. Therefore, tape can reasonably

18   be considered a foreign substance within this definition. AR 750 states that any adulterated mail

19   "will not be issued to the inmate." Therefore, a *Turner* analysis is appropriate here.

20   Defendants' practice of returning mail to the sender unopened when such mail contains

21   an unknown or foreign substance (and is therefore "adulterated" under AR 750), is rationally

22   connected to a legitimate governmental interest. The state has a legitimate interest in preventing

23   illegal chemical drugs from coming into LCC, which can occur when such drugs are concealed

24   under tape or stickers (#78, p. 21). This interest is rationally served by prohibiting tape and

25   stickers on incoming mail. Second, plaintiffs have alterative means of exercising their right to

26   send and receive mail. Indeed, Sikorski and Dittmer both exercised this right by resending the

27   mail without tape. Third, there would be a great impact in accommodating the receipt of incoming

28   mail with tape or stickers. "Allowing adhesives and stickers to be introduced into the prison

1   would result in adverse effects on guards, other inmates, and prison resources generally, because

2   it would enable inmates to receive mail containing contraband such as narcotics." *Jeffries*, 2008

3   WL 3200802, *4. Finally, plaintiffs do not provide any alternatives to the prison's practice of

4   returning such mail unopened. As all of the *Turner* factors are satisfied, defendants practice of

5   returning such mail unopened is rationally related to a legitimate penological interest and does

6   not violate plaintiffs' First Amendment rights.

7            Due Process also does not require defendants to provide plaintiffs notice and an

8   opportunity to appeal the decision. Plaintiffs claim no liberty interest under AR 750, and "[i]t is

9   questionable whether an inmate even has a First Amendment right to be given notice when his

10  mail is rejected for such violations." *Id*. at *5. Additionally, under a *Turner* analysis, LCC's

11  policy of not giving notice and an opportunity to appeal to inmates regarding mail that was

12  returned to the sender because of noticeable violations on the outside of the envelope does not

13  violate plaintiffs' First or Fourteenth  Amendment rights. First, defendants contend the

14  governmental interest at stake here is the conservation of prison resources. There is a valid and

15  rational connection between the practice of not providing notice to the inmate in these situations

16  and this legitimate governmental interest. Providing notice to every inmate for every piece of mail

17  containing tape, stickers, or other noticeable violations would misuse and drain very limited

18  prison resources, which could actually "heighten[] [the] chances that contraband may

19  inadvertently be allowed into the prison." Second, inmates still have an alternative means of being

20  notified of the returned mail and of receiving such mail. The sender is notified of the violation

21  as soon as he or she receives the returned mail, as LCC staff mark that mail was returned because

22  of the tape, stickers, or other noticeable violation. The sender can then return this mail in an

23  envelope without tape, as actually occurred here. The sender could also inform the inmate via

24  telephone that the mail had been returned. Third, accommodation of giving notice and an

25  opportunity to appeal for every piece of mail with a noticeable violation would place a significant

26  burden on prison resources. Forth, plaintiffs offer no ready alternatives to this practice that would

27  not strain limited prison resources.

28            Neither plaintiffs nor defendants have indicated any controlling cases, which discuss an

inmate's rights or a prison's duties when returning mail to the sender unopened for "noticeable violations" on the envelope. Although *Jeffries* is not binding on this court, it is informative of how another District Court has analyzed a prison's policy to return unopened mail without giving notice. However, as there appear to be no binding cases discussing this issue, the law is certainly not clearly established, and defendants are entitled to qualified immunity, as more fully discussed below.

### a)      Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (internal quotation marks omitted). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that rights. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted).

"Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id*. At 741. Accordingly, qualified immunity will be denied if a case involves "the mere application of settled law to a new factual permutation." *Porter v. Bowen*, 496 F.3d 1009, 1026 (9th Cir. 2007). However, even if the violated right was clearly established, it may be difficult for an officer to fully appreciate how the legal constraints apply to the specific situation he or she faces. *Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir. 2005 (en banc)). "Under such circumstance, if the officer's mistake as to what the law requires is reasonable,...the officer is entitled to the immunity defense." *Id*. (brackets and internal quotation marks omitted). In essence, "[o]fficers are entitled to qualified immunity unless they have been given fair notice that their conduct was unreasonable in light of the specific context of the case." *Winterrowd v. Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007) (internal quotation marks omitted).

Prior to *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court mandated a two-step framework for deciding the issue of qualified immunity. First, courts were to decide whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court answered this question affirmatively, the court would then ask whether the constitutional right was clearly established. *Id.* In *Pearson*, the Supreme Court reconsidered the two-step framework and held that courts are not required to address whether there was a constitutional violation before deciding whether the constitutional right at issue was clearly established. 129 S. Ct. at 818. However, the Supreme Court also stated that courts may continue to follow the two-step framework as a matter of discretion. *Id.*

The court has not found ,and plaintiffs have not cited, any case which stands for the proposition that plaintiffs are entitled to notice and an opportunity to appeal before[17] or after mail is returned unopened due to defects on the envelope. Nearly all of the cases cited discuss when due process is required when mail is rejected and returned to sender or withheld from the prisoner due to the content of the letter or publication (obscenity, discussion of criminal activities, other security concerns). *Jeffries* is the only case cited that discusses a prisoner's rights when mail is returned unopened. As stated earlier, this is a District of Oregon case and is therefore not binding on this court. Plaintiffs have cited any Ninth Circuit cases that are binding on this court that come

_____

[17] Although plaintiffs claim that "the issue is whether [unopened] mail may be returned to sender *without notice* and an opportunity to appeal *before* the mail is returned to sender" (#85, p. 12, n. 9, #77, p. 14) (first emphasis in original; second emphasis added), *Martinez* does not hold that notice and opportunity to appeal be given before the mail is returned. *See* 416 U.S. 396. The cases that plaintiffs cite also do not hold such and do not discuss when the mail is to be returned. *See Krug*, 329 F.3d at 697-98 (holding that inmates were entitled to a two-level review when appealing a decision to reject mail), *Campbell v. Sumner*, 587 F. Supp. 376, 378 (D. Nev. 1984) (discussing a prisoners right to have privileged mail opened in front of him). Further, in an unpublished opinion, the Ninth Circuit found that even when mail is opened and rejected and returned because of its contents, the mail may be returned to the sender before appeal, the sender can return it if the prisoner prevails on appeal, and this is not a violation of the inmate's procedural due process rights. *McGann v. Stock*, 884 F.2d 582 (9th Cir. 1989) (unpublished). Therefore, although *Martinez* necessitates "minimum procedural safeguards" when mail is withheld, it did not hold that a prison must retain possession of an article of mail until after the appeals process is complete before it can return the mail to the sender.

1   to the opposite (or even the same) conclusion as *Jeffries*. Therefore, the law is not clearly

2   established and defendants are entitled to qualified immunity.[18]

3               **3.      Sixth Cause of Action - Sager Mail**

4               Defendants next contend that they are entitled to summary judgment on the sixth cause

5   of action because prison officials may prohibit correspondence between inmates based on security

6   concerns (#78, p. 23). Defendants state that the "Sager Mail" was returned because it contained

7   confidential information about another NDOC inmate and the crime committed by that inmate.

8   *Id*. Defendants again argue that plaintiff Witherow has no liberty interest in AR 750 and that their

9   policy of prohibiting correspondence between inmates is rationally related to a legitimate

10  penological interest and is valid under the *Turner* analysis. Defendants also defend their actions

11  based upon AR 569, which prohibits inmates from possessing "information that would endanger

12  the health or safety of the subject or other persons, endanger the security of any departmental

13  facility, [or] disclose personal information pertaining to a person other than the inmate when the

14  information would not reasonably be part of the inmate's knowledge or experience" (#81, p. 28).

15  Additionally, defendants are entitled to qualified immunity.

16          Plaintiffs respond that because Sager was not an inmate, there was no inmate-to-inmate mail

17  involved, and that the Sager mail contained only public records and voluntarily disclosed

18  information that Sager was authorized to disclose (#86, p. 17). Plaintiffs contend that AR 722 is

19  not applicable here because Sager, and not another inmate, sent the documents (#77, p. 15-16).

20  Further, a *Turner* analysis is not appropriate because "*there is no regulation prohibiting or*

21  _____

22          [18]In reply, plaintiffs state that defendants are not entitled to qualified immunity because
    "[p]laintiffs' right to notice and an opportunity to appeal a decision to censor or withhold delivery
23  of mail were sufficiently clearly established and any reasonable person would, or should, know that
    returning mail to sender without notice and an opportunity to appeal was a violation of Plaintiffs'
24  constitutional rights" (#85, p. 17). Plaintiffs seem to be referring to three different actions as one in
    the same. Censoring is not the same as withholding delivery due to content, which is not the same
25  as returning mail unopened due to noticeable violations. As such, there are different due process
    requirements related to each of these actions. Even if the law is clearly established with regard to
26  what due process is necessary when mail is censored or withheld because of the content of a letter
    or contraband found in an envelope, that does not necessarily prove that the law is clearly established
27  as to what due process is necessary when mail is returned unopened and unread based on a noticeable
    defect found on the *outside* of the envelope.
28
                                    28

1   *restricting Witherow's right to receive and possess public record information pertaining to*

2   *another inmate.*" *Id*. (emphasis in original). Finally, defendants are not entitled to qualified

3   immunity because Witherow had a clearly established right to receive and possess public records

4   and other information sent to him by a non-prisoner. *Id*. Defendants offer no reply to thier initial

5   arguments.

6       In *Turner v. Safley*, the Supreme Court held that a prison officials may entirely prohibit

7   correspondence between inmates based on security concerns. 482 U.S. at 92-3. AR 750 limits

8   correspondence "between all incarcerated persons...to immediate family members." AR

9   750.04.1.1.2, D-MSJ 981. AR 722 allows inmates to provide legal assistance to other inmates.

10  AR 722.04.1..3.1; #78, D-MSJ 1010. Further, it allows the assisting inmate to be in possession

11  of another's legal opinions, books, papers and forms, with the permission of the owner, the

12  inmate receiving assistance. AR 722.04.1.3.2. However, AR also specifically states that if the

13  inmate receiving assistance is transferred, released, or placed in segregation, the assisting inmate

14  must return all legal papers "unless a court order is obtained, or the inmate is an active co-

15  defendant or co-plaintiff on the current case being litigated" AR 722.04.1.3.3.

16      Although the legal documents in question were sent to Witherow by a non-inmate, and

17  were technically not correspondence between inmates, the mail contained another inmate's legal

18  documents. Therefore, the mail can be characterized as "inmate-to-inmate piggybacking." Under

19  *Turner*, defendants may entirely prohibit correspondence between inmates based on security

20  concerns. Defendants state that there is a "rational relationship between withholding the mail

21  from Witherow and promoting prison security because under AR 569 inmates are not allowed to

22  possess information that would endanger the health or safety of the subject or other persons,

23  endanger the security of any departmental facility, disclose personal information pertaining to a

24  person other that the inmate's knowledge or experience" (#78, p. 23-24).  The court agrees.

25  Defendants have a security interest in not allowing "unrestrained access" to prisoners' records.

26  *Id*. p. 24. Therefore, the prohibition of correspondence between inmates was permissible in this

27  case.  Additionally, pursuant to AR 722, Witherow is not permitted to be in possession of another

28  inmate's legal files unless that inmate has given permission and lives in the same institution as

1    Witherow. Defendants did not violate Witherow's First Amendment rights by withholding these

2    documents, and defendants' motion for summary judgment is granted as to the sixth cause of

3    action.

4          **4.       Seventh Cause of Action - Hines Mail**

5          Defendants argue that they are entitled to summary judgment on the seventh cause of

6    action because they properly returned mail from Pat Hines without notice to Witherow pursuant

7    to the Unopened Mail policy (#78, p. 24). The letter contained a sticker on the envelope, which

8    is prohibited by AR 750; therefore, defendant Tupa properly returned the letter and was not

9    required to give notice to Witherow. *Id*. p. 24-25. Defendants also contend they are entitled to

10   summary judgment based on a *Turner* analysis and qualified immunity. *Id*. p. 25. Additionally,

11   Witherow failed to exhaust his administrative remedies, and his claims in the seventh cause of

12   action should be dismissed for this reason. *Id*. p. 25-26.

13         Plaintiffs again contend that because there is no valid, written, approved and published

14   "Unopened Mail Policy" permitting the return of mail without notice, a *Turner* analysis is not

15   appropriate, and the court should determine whether there was an arbitrary government invasion

16   of constitutional rights (#86, p. 18). Plaintiffs assert that "there is no serious security concern over

17   substances being concealed under mailing labels. The real concern is the lack of staff and

18   financial resources, which cannot be the basis of the denial of due process." *Id*. Additionally,

19   defendants are not entitled to qualified immunity because Witherow had a clearly established

20   right to notice that Hines's mail was being withheld before the mail was returned to the sender.

21   *Id*. Finally, plaintiffs argue that Witherow did exhaust his administrative remedies "because he

22   prevailed on the grievance at the informal level and there is no procedure in AR 7[4]0 for

23   appealing to a higher level when prevailing at a lower level." *Id*. p. 19.

24         Defendants stand on their previous arguments (#90, p. 18). Additionally, defendants point

25   out that plaintiffs admitted that Witherow only filed an informal grievance (GR 2006-19-6032).

26   Further, the grievance dealt with two issues, namely the return of the mail and the lack of notice.

27   "Witherow did not object to the responses of D-MSJ 912, that defended the return of the mail,

28   on safety and security grounds. Witherow believes that his grievance was upheld based on the

1   response by Van Pelt, stating that he should have received a notification that his mail was being

2   returned." *Id*. p. 19. n. 43. However, defendants argue that the first issue, the return of the mail,

3   was not fully grieved. *Id*. p. 19.

4          This cause of action alleges analogous facts to causes of action IV and V, and the only

5   difference here is that Tupa is named defendant. Additionally, there are some exhaustion concerns

6   here that were not present in causes of action IV or V. As to exhaustion, the court agrees that

7   Witherow is not required to appeal a grievance when he prevails at the informal or first level.

8   However, the court also agrees with defendants that Witherow is required to appeal any issues

9   on which he did not prevail. Here, Witherow prevailed on the notice issue, but Van Pelt agreed

10  that defendant Tupa properly returned the mail unopened because of the sticker. Witherow objects

11  both to the fact that the mail was returned and to the lack of notice and opportunity to appeal,

12  although his primary concern appears to be lack of notice. Witherow properly grieved this issue.

13  However, regardless of whether Witherow properly grieved, there are no issues of material fact

14  as to whether defendants violated Witherow's constitutional rights by returning the Hines mail

15  without giving Witherow notice or an opportunity to appeal. As the court explained in its analysis

16  of the fourth and fifth causes of action, the prison's practice of returning mail to the sender

17  unopened when the envelope contains a "noticeable violation" is rationally related to a legitimate

18  penological interest. Further, Witherow does not have a clearly established right to such notice

19  and opportunity to appeal in this situation, as his mail was returned unopened, and not censored

20  or rejected based on the content of the mail. Thus, defendants are entitled to qualified immunity,

21  and defendants motion for summary judgment is granted as to the seventh cause of action.

22          **5.      Eighth Cause of Action - Varnum/Returned Mail**

23          Witherow alleges that defendant Feil retaliated against him on multiple occasions.

24  Specifically, plaintiffs claim that Feil retaliated against Witherow on July 7, 2005, after Witherow

25  wrote grievances against her for refusing to deliver the Petition to him, by writing a notice of

26  charges against him, and by charging him with two major violations of the NDOC Code of Penal

27  Discipline "based upon a letter and legal documents sent to plaintiff Witherow by a person

28  unknown to him ...requesting his assistance with the legal problem of another prisoner"

31

(Lader/Lammers letter) (#61, p. 4-5). These charges were later dismissed. *Id*. Witherow also contends that Feil retaliated against him on August 30, 2005, when she directed the mailroom officer to censor and refuse to deliver the Scarborough letter to him. *Id*. p. 5, #78, D-MSJ 885. The mailroom officer, whose identity is apparently unknown, as previously discussed, stated that the mail was unauthorized because it was a "letter from inmate to inmate" (#78, D-MSJ 885). Plaintiff did not file a grievance regarding this unauthorized mail notification because "he feared Defendant Feil would again file retaliatory and baseless disciplinary charges against him" (#61, p. 5). Witherow also claims that defendant Feil retaliated against him on September 19, 2005, when she wrote a notice of charges against him for sending a letter and a newspaper article to a non-inmate friend, a Jackie Varnum, in which Witherow asked Varnum to pass on the information in the article to a friend confined in another NDOC prison. *Id*. p. 6. These charges were also later dismissed. *Id*.

Defendants assert that summary judgment should be granted as to the eighth cause of action because plaintiff Witherow will not be able to prove all of the elements of retaliation (# 78, p. 26). First, defendants claim that plaintiff cannot prove up "the 'adverse action' requirement by stating that the adverse action, was his chilled first amendment rights." *Id*. Next, plaintiffs cannot demonstrate that defendant Feil's actions as they concern Witherow's mail, failed to promote a legitimate correctional goal. *Id*. p. 27. Specifically, defendants contend that defendant Feil's actions in issuing a notice of charges against Witherow for the Lader letter advanced a legitimate penological interest because "Feil had a valid basis for believing that Witherow improperly solicited legal paperwork and piggy-backed correspondence from Lader, who clearly sought legal advice from Witherow, and used inside colloquialisms, such as "Loose Cannon Lader" and other informal language suggesting that Witherow had knowledge of the persons involved, including the sender." *Id*. p. 28. Witherow also suffered no adverse action because the disciplinary charges were dismissed. *Id*.

With regard to the Scarborough letter, defendants assert that Feil was not involved in the decision to withhold the mail, and that Feil based her decision to not forward the Scarborough mail on security concerns about contraband. Witherow also suffered no adverse action because

no notice of charges was issued. Witherow also failed to exhaust his administrative remedies with regard to the Scarborough mail. *Id.* As to the Varnum letter, defendants claim that Witherow cannot prevail on his retaliation claim because "Witherow admitted that he sent newspaper clippings to another inmate, and Feil honestly believed that doing so violated the rules. A good faith belief motivated Feil's actions, and she never retaliated against Witherow...." *Id.* As to the Sikorski/Dittmer letters, defendants contend that Feil had a legitimate penological interest in returning the letters because the envelopes contained tape, which created a security concern. *Id.* Witherow also suffered no adverse action because the letters were ultimately returned to him. *Id.* Finally, "based on the totality of the documents here, including grievances, appeals, and references to other legal activity commenced by Witherow, including the *Evans-Witherow* litigation, no reasonable juror could conclude that as a result of the alleged retaliatory acts, Witherow suffered a "chilling" of his exercise of his First Amendment rights." *Id.* p. 29. Defendants also argue that defendants Chacon, Vare and Cox were reasonable in their responses to Witherow's grievances; therefore, summary judgment should be granted in their favor. *Id.* p. 29.

Plaintiffs claim that when Feil withheld the Petition, Witherow suffered "the adverse action of having his rights violated and the accompanying emotional distress. He also suffered deprivation of the public information contained in the [P]etition and a 3 month delay in having his [P]etition sent to the Governor" (#86, p. 20). Plaintiffs further state that there is a disputed fact in that Witherow had included the unauthorized mail notice in the envelope with the Petition "when Witherow left the envelope in Carey's possession. What Carey, Feil, the Governor, o[r] the Governor's staff did with the unauthorized notice is an issue for the jury to consider in light of the evidence." *Id.* Additionally, as to the Lader mail, plaintiffs claim that defendant Feil fabricated a notice of charges regarding the letter Rebecca Lammers sent to Witherow because she stated plaintiff received a letter from Lader. *Id.* Plaintiff also claims that he suffered adverse action by being denied the Lader/Lammers letter, "the violation of his First Amendment right to receive mail and emotional distress by having false disciplinary charges written against him." *Id.* As to the Varnum mail, plaintiff claims that Witherow suffered the adverse action of having false

disciplinary charges written against him and of being deprived of his mail for over one month. *Id*. p. 21. As to the Sikorski/Dittmer mail, Witherow "suffered the adverse action of having his rights violated, the deprivation of his mail for six (6) weeks, and anger, frustration and emotional distress." *Id*.

In reply, defendants stand on the arguments presented in their motion for summary judgment (#90, p. 19). Additionally, they maintain that although the Petition was delayed three months, Witherow did not suffer an actionable deprivation because "[d]elays encountered in the handling of mail, for security purposes, do not violate a first amendment right," and all delays in this case arouse from security concerns. *Id*. Defendants also argue that "Plaintiffs err when claiming emotional distress[] damages here, which are not recoverable under the PLRA, absent a physical injury, which is not alleged here." *Id*. p. 19, n. 44, citing 42 U.S.C. § 1997e(e) "(no federal civil action may be brought by a prisoner for mental or emotional injury suffered while in custody, without a prior showing of physical injury)."

Prisoners have a right to meaningful access to the courts, and prison authorities may not penalize or retaliate against an inmate for exercising this right. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995). Prison officials may be sued under Section 1983 for retaliating against a prisoner for exercising his or her constitutional rights. *Pratt v. Rowland*, 65 F.3d 802, 806 & n. 4 (9th Cir. 1995). A retaliation claim involves five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004). Retaliation claims must be evaluated in light of the deference accorded to prison officials. *Id*. at 807. The inmate bears the burden of pleading and proving the absence of legitimate correctional goals for the alleged retaliatory action. *Id*. at 806; *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). The Ninth Circuit has recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent." *Pratt*, 65 F.3d at 808.

Viewing the evidence in the light most favorable to plaintiffs, the court concludes that there are no issues of fact as to whether defendant Feil issued notices of charges against Witherow

1  for legitimate correctional reasons rather than in retaliation for plaintiff accessing the grievance

2  process. First, plaintiffs have not demonstrated that defendant Feil retaliated against Witherow

3  by withholding the Petition.  Plaintiffs argue that Feil withheld the Petition because of a previous

4  lawsuit Witherow filed, *Evans-Witherow*. However, it appears that Feil did not know about this

5  case as she was not a named defendant; therefore, she could not have retaliated against Witherow

6  because of it.  Moreover, Witherow did not suffer an adverse action because the Petition was

7  withheld. Defendant Feil did not issue a notice of charges and the Petition was sent to the

8  Governor.[19] Further, Witherow  does not demonstrate that defendant Feil's withholding of the

9  Petition did not advance a legitimate penological goal. Feil states that she withheld the Petition

10  because she believed it would jeopardize the security of the signatories to do otherwise. This

11  action advances the legitimate correctional goals of safety and security. Finally, Witherow did not

12  exhaust his administrative remedies with regard to this retaliation claim.

13      Second, plaintiffs have also failed to demonstrate that defendant Feil retaliated against

14  Witherow by issuing a notice of charges in relation to the Lader/Lammers letter. The charges

15  against Witherow were dismissed, and he suffered no adverse action. Further, in this case, the fact

16  that the charges were dismissed does not undermine defendant Feil's belief that Witherow

17  improperly solicited legal work. The court agrees that the use of colloquialisms such as "Loose

18  Cannon Lader" suggested that Witherow may have had knowledge of the sender and persons

19  involved. Therefore, plaintiffs have not shown that Feil acted with retaliatory intent rather than

20  to advance a legitimate correctional goal.

21      Third, plaintiffs have not demonstrated that defendant Feil retaliated against Witherow

22  by writing a notice of charges with regard to the Varnum mail. There is no evidence that Feil

23  acted with retaliatory intent. The charges against Witherow were dismissed. Additionally, the

24  mere act of issuing a notice of charges does not demonstrate that Feil was retaliating against

25  _____

26      [19]The court acknowledges that there was a three-month delay in sending the Petition to the
Governor. However, Witherow has not shown how this delay caused him to suffer a deprivation of

27  his First Amendment rights, as he was able to Petition the government. Further, the court agrees with
defendants that the PLRA does not allow damages for emotional distress without accompanying

28  physical injury, which is not alleged here.

Witherow since Feil's reason for issuing the notice of charges advanced a legitimate correctional goal of preventing inmate-to-inmate correspondence. Although the charges were dismissed, Witherow has not demonstrated that Feil issued the notice of charges with a retaliatory motive rather than because she actually believed the mail violated AR 750.

Fourth, plaintiffs have presented no evidence that Feil retaliated against Witherow by returning the unopened Sikorski and Dittmer letters. This mail was returned to Witherow and no notice of charges was issued against him. Further, returning this mail based on the tape found on the envelope advanced a legitimate correctional goal of preventing drugs and contraband from entering the prison.

Fifth, plaintiffs have presented no evidence that Feil was involved in the decision to issue an unauthorized mail notification for the Scarborough mail. It does not appear that Feil issued the unauthorized mail notification, and no notice of charges was filed against Witherow. Witherow does not demonstrate that the withholding of the Scarborough mail did not advance a legitimate correctional goal, as it contained a letter from another inmate, and as previously discussed, prison officials may completely prohibit correspondence between inmates.

Finally, with regard to all of Witherow's retaliation allegations, plaintiffs have not shown that Witherow's exercise of his First Amendment rights was chilled. Witherow has filed numerous grievances and lawsuits against NDOC officials, including against defendant Feil.

### 6.   Count IX and X - Failure to Train

Defendants contend that they are entitled to summary judgment on all claims in the ninth and tenth causes of action, in which plaintiff alleges that defendants failed to adopt or implement training procedures (#78, p. 29). Defendants state that mere negligence is insufficient to state a claim under Section 1983, and that "Defendants' actions were based in policy, including the "Unopened Mail" policy, not on a failure to be adequately trained." *Id*. If defendants did make mistakes, they were merely negligent and did not violate plaintiffs' constitutional rights. *Id*. Defendants contend that Carey, Chacon, Feil, Perino, and Tupa all received adequate training. *Id*. p. 30. Additionally, defendants are entitled to qualified immunity.

With regard to count IX, plaintiffs claim that defendants Vare, Palmer, LeGrand, and Does

36

1    VII-X have failed to provide any training to Feil and Tupa in their duties and responsibilities as

2    mail room officers in the handling of prison mail, which "establishes a deliberate indifference

3    and/or reckless disregard for the constitutional rights of prisoners and their correspondents in the

4    handling and delivery of their mail" (#86, p. 23). Additionally, defendants are not entitled to

5    qualified immunity. *Id*. As to count X, plaintiffs argue that "Defendants Whorton and Crawford

6    failed to adopt adequate or sufficient regulations for the training of NDOC employee[s] in

7    individual job assignments and, as a result...Defendants Feil and Tupa were not adequately or

8    sufficiently trained and Plaintiffs constitutional rights were violated." *Id*. p. 24. Defendants reply

9    that Feil and Tupa received relevant training impacting an inmate's constitutional rights and mail,

10   as evidenced by the certificates of training that defendants attached (#90, p. 20). Additionally,

11   defendant Gutierrez was the instructor for such classes. *Id*. Defendants argue that "Plaintiffs'

12   claims that Tupa and Feil were not trained are belied by the evidence presented, including training

13   certificates, which show that training was provided. According to the evidence supplied, much

14   of which Plaintiffs ignore, there is simply no basis for stating that a claim exists, for deliberate

15   indifference and or reckless disregard for the constitutional rights of prisoners and their

16   correspondence in the handling and delivery of their mail." *Id*.

17        "It is well-established that a governmental officer may be held liable for damages for

18   constitutional wrongs engendered by his failure to adequately supervise or train his subordinates."

19   *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991). The inadequacy of training "may serve

20   as a basis for liability under section 1983... 'only where the failure to train amounts to deliberate

21   indifference to the rights of persons with whom the [subordinates] come into contact.'" *Id*., citing

22   *City of Canton v. Harris*, 489 U.S. 378 (1989) (discussing the standard for municipal liability for

23   failure to train). "Supervisory liability can exist if [a defendant] implemented 'a policy so

24   deficient that the policy itself is a repudiation of constitutional rights and is the moving force of

25   the constitutional violation." *MacKinney v. Nielson*, 69 F.3d 1002, 1008 (9th Cir. 1995).

26        Defendants have attached all training certificates and programs schedules for defendants

27   Carey, Feil, Tupa, Chacon, and Perino (#78, D-MSJ 739-870). It appears that they all attended

28   a "Correctional Officer Basic Training Program," numerous refresher courses, and had extensive

1    on-the-job training and testing. *Id*. As plaintiffs only allege that defendants Feil and Tupa were

2    not trained with regard to mail procedures, the court will focus on these two defendants.[20] With

3    regard to defendant Feil, she received a 220-hour Basic Training Program, which included

4    training on "Inmate Mail Handling Procedures," "Legal Liability in Corrections," "Inmate Civil

5    Rights," "AG's Legal Issues in Corrections,"and "Legal Terms Definition Review." *Id*. D-MSJ

6    814-816. She was also tested on the Code of Penal Discipline. *Id*. D-MSJ 816. She received ten

7    hours of on-the-job training with defendant Gutierrez on property, including "unauthorized

8    procedures" and "package procedures." *Id*. D-MSJ 818. She also attended multiple refresher

9    training on these issues. *Id*. D-MSJ 822, 831. Additionally, defendant Feil testified that she

10   received training consisting of asking peers, supervisors and the Lovelock post office for

11   assistance, as well as on-the-job training (#78, D-MSJ 265, p. 20, l. 20-25).

12       With regard to defendant Tupa, she participated in a 360-hour basic training program,

13   which included training in "Mailroom Procedure," "Correctional Case Law," "Inmate

14   Constitutional Rights," and "Legal Terms and Definitions *Id*. D-MSJ 861-62. Tupa also read

15   numerous documents as part of her training, including the POST orders for the mail room officer,

16   the Institutional Procedure for mail room operations, and AR 750. *Id*. D-MSJ 299-300, p. 17-18.

17   Tupa also received on-the-job training from Feil, in which Feil told Tupa what to do on a daily

18   basis. *Id*. Feil also trained Tupa on AR 750. *Id*. D-MSJ 300, p. 19. Further, if Tupa had a question

19   about mail room procedures or AR 750, she asked questions of caseworkers and defendant

20   LeGrand. *Id*.

21       Based on this evidence, the training programs administered by NDOC and LCC are not

22   "so deficient that the [training program] itself is a repudiation of constitutional rights and is the

23   moving force of the constitutional violation." There is no evidence of a failure to train that

24   amounts to deliberate indifference to the rights of inmates. Defendants Feil and Tupa both

25

26   _____

27   [20]However, the court notes that there is also evidence that the other defendants received
     training on mail handling procedures, property handing, discipline, inmate grievance procedures, and
28   legal issues (*see* #78, D-MSJ 744, 752, 757, 763, 769, 773 (Carey); D-MSJ 775, 776, 778, 785, 789,
     794, 805 (Chacon); D-MSJ 839, 841 (Perino)).

received hundreds of hours of classroom and on-the-job training, including training on mailroom procedures. They had refresher courses on inmate discipline and the legal rights of inmates. They received on-the-job training on mailroom procedures. They asked superiors when they were unsure of how to classify or deliver an article of mail. They read the ARs and IPs related to mailroom procedures. Such training does not demonstrate that defendants Gutierrez, Whorton, Crawford or other NDOC officials were deliberately indifferent to plaintiffs' constitutional rights. The length and extent of introductory training courses, refresher courses, and on-the-job training also does not demonstrate that defendants Whorton and Crawford failed to adopt, implement or enforce training regulations or programs that were so deficient as to be a repudiation of plaintiffs constitutional rights or the moving force of any constitutional violation.[21]

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes as follows:

First and Second Causes of Action: Defendants are entitled to summary judgment because there are no issues of material fact as to whether plaintiffs are entitled to declaratory or injunctive relief. Plaintiffs' constitutional rights were not violated. Therefore, such relief is improper.

Third Cause of Action: Defendants are entitled to summary judgment because there is no issue of material fact as to whether Witherow had a First Amendment right to receive the Petition.

Fourth, Fifth, and Seventh Causes of Action: Defendants are entitled to summary judgment because there are no issues of material fact as to whether defendants could return unopened articles of mail to their senders because of noticeable violations on the outside of the envelope, without giving Witherow notice and without giving Witherow or the senders and opportunity to appeal. This practice does not violate plaintiffs' First or Fourteenth Amendment rights.

---

[21]As the court has granted summary judgment on all causes of action and for all defendants, it does not discuss defendants arguments regarding "Doe" amendments. However, the court notes that "the relation back provisions of state law, rather than Rule 15(c), govern a federal cause of action pursuant to 42 U.S.C. § 1983. *See Merritt v. County of Los Angeles*, 875 F.2d 765, 768 (9th Cir. 1989). The court also does not discuss plaintiffs' first and second causes of action for declaratory and injunctive relief because there are no issues of material fact as to whether plaintiffs constitutional rights were violated.

1      <u>Sixth Cause of Action</u>: Defendants are entitled to summary judgment because there are
2  no issues of material fact as to whether defendants violated Witherow's First and Fourteenth
3  Amendment rights when they withheld the Sager mail. Witherow does not have a right to possess
4  another inmate's legal materials in this situation.

5      <u>Eighth Cause of Action</u>: Defendants are entitled to summary judgment because there are
6  no issues of material fact as to whether defendant Feil retaliated against Witherow for exercising
7  the grievance system. Plaintiffs have failed to demonstrate facts sufficient to uphold any of the
8  elements of retaliation.

9      <u>Ninth and Tenth Causes of Action</u>: Defendants are entitled to summary judgment because
10  there are no issues of material fact as to whether defendants Feil and Tupa were adequately
11  trained or whether defendants adopted and implemented sufficient training procedures.

12      As such, the court recommends that defendants' motion for summary judgment (#78) be
13  **GRANTED** as to all counts, and plaintiffs' motion for partial summary judgment (#77) be
14  **DENIED**.

15      The parties are advised:

16      1.   Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice,
17  the parties may file specific written objections to this report and recommendation within ten days
18  of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and
19  Recommendation" and should be accompanied by points and authorities for consideration by the
20  District Court.

21      2.   This report and recommendation is not an appealable order and any notice of appeal
22  pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's
23  judgment.

24  *///*

25  *///*

26  *///*

27  *///*

28  *///*

# IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#78) be **GRANTED** as to all counts, and plaintiffs' motion for partial summary judgment (#77) be **DENIED**.

**DATED:** April 30, 2009.

_____

**UNITED STATES MAGISTRATE JUDGE**

41